*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 12a0350p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT
_____

---

FRANK BOGGIO,

    *Plaintiff-Appellant*,

*v.*

USAA FEDERAL SAVINGS BANK,

    *Defendant-Appellee.*

No. 11-4040

---

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 1:10-cv-445—Herman J. Weber, District Judge.

Decided and Filed: September 27, 2012

Before: MERRITT, MOORE, and McKEAGUE, Circuit Judges.

_____

## COUNSEL

**ON BRIEF:** Stephen R. Felson, Cincinnati, Ohio, for Appellant. James H. Grove, Nicholas J. Dertouzos, NICOLA, GUDBRANSON & COOPER, LLC, Cleveland, Ohio, for Appellee.

_____

## OPINION

_____

    KAREN NELSON MOORE, Circuit Judge. Plaintiff-Appellant Frank Boggio ("Boggio") appeals a grant of summary judgment, contending that a reasonable jury could find that Defendant-Appellee USAA Federal Savings Bank ("USAA") violated the Fair Credit Reporting Act ("FCRA") because it failed to investigate adequately and to respond accurately to notices, sent to it by various consumer reporting agencies ("CRAs"), about a disputed car loan. Because we conclude that a jury could find both that USAA's investigation was unreasonable and that Boggio was not responsible for the

debt, we **REVERSE** and **REMAND** for further proceedings consistent with this opinion.

## I. BACKGROUND & PROCEDURE

Boggio and his wife, Sarah Boggio ("Sarah"), resided in Texas during the mid-2000s. R. 15-3 (Boggio Dep. at 6–7) (Page ID #100). Boggio served two military tours during the marriage, and for the duration of each he assigned power of attorney to his wife. *Id.* at 15–17 (Page ID #102). The Boggios separated in November 2006. *Id.* Boggio moved out of state and left Sarah with considerable financial authority to wrap up the marriage, which extended to selling the house. *Id.* at 19–24 (Page ID #103–04). On May 29, 2007—approximately six months after the separation and two months after Boggio's honorable discharge, but before the house was sold—Sarah purchased a Honda Civic through financing that she secured with USAA. R. 1-1 (Purchase Agreement at 1) (Page ID #5); R. 15-3 (Boggio Dep. at 18) (Page ID #103). The car purchase begins this dispute: Sarah allegedly signed Boggio's name, unbeknownst to him, alongside her own on the check issued by USAA to the car dealership.[1] R. 16-2 (Galindo Dep. at Ex. F) (Page ID #195). The car would later be listed on Boggio's USAA car insurance.[2] R. 15-6 (USAA policy at 5) (Page ID #133).

Boggio claims that he first learned of the purchase during divorce proceedings in December 2008. During the proceedings he signed a separation agreement, which confirmed that the car was acquired during the marriage, identified the associated secured loan as a marital debt, and stated that Sarah alone would be responsible for paying the loan. R. 15-2 (Divorce Decree at 4) (Page ID #94). Boggio admits that, by the time he signed the separation agreement, USAA's car loan would have appeared on

---

[1] On the record presented, only the check is "signed" by Boggio. USAA's security agreement lists Boggio as a co-signor, but it does not include his signature. R. Galindo Dep. at Ex. G (Page ID #196–99). Neither USAA's loan authorization agreement nor its correspondence with Sarah mentions Boggio. *Id.* at Exs. H, M (Page ID #200, 205). As to the car sale, the purchase documents—the credit application, arbitration agreement, conditional sales agreement, and purchase agreement—address only Sarah. *Id.* at Exs. I–L (Page ID #201–04).

[2] USAA claims that a prior GEICO insurance policy in Boggio's name identifies the car and USAA's lien. Appellee Br. at 19. The document provided does name Boggio, but nowhere mentions either a 2007 Honda Civic or USAA's lien. R. 15-5 (GEICO Policy) (Page ID #131).

his credit report. R. 15-3 (Boggio Dep. at 37) (Page ID #107). A Kentucky court incorporated the separation agreement into its divorce decree on June 5, 2009. R. 15-2 (Divorce Decree at 2) (Page ID #92).

In October 2009 Boggio, now residing in Cincinnati, experienced credit problems that he traced to Sarah's falling behind in payments on the car loan. Boggio, through his divorce attorney, wrote to the CRAs and to USAA directly to dispute his status as a co-obligor on the car loan. R. 1-2–6 (Letters) (Page ID #6–14). From October 2009 through January 2010, USAA received requests from all three major CRAs to verify the disputed loan. R. 15-4 (Galindo Decl. ¶ 7) (Page ID #123). USAA reported back to each CRA that Boggio was a co-obligor. R. 15-4 (Galindo Decl. ¶¶ 12–13) (Page ID #123–24). USAA also attempted to mail Boggio (but not his counsel) a copy of the allegedly forged check, but the letter was sent to an incorrect Texas address. *Id.* at Ex. 2 (Page ID #127–28). On March 11, 2010, USAA informed Boggio that it would further investigate the dispute if he provided a police report or a fraud affidavit. R. 15-1 (Lincoln Decl. ¶¶ 8–9) (Page ID #90); R. 15-4 (Galindo Dep. at Ex. 1) (Page ID #126). On March 12, 2010, upon receiving confirmation from Boggio's attorney that Boggio would not go to Texas to file a police report, USAA declared the dispute a civil matter between the Boggios. R. 15-4 (Galindo Dep. at Ex. 1) (Page ID #126). Boggio brought suit against USAA under FCRA on July 6, 2010 in the U.S. District Court for the Southern District of Ohio. The district court granted summary judgment to USAA, and Boggio timely appealed.

## II.  STANDARD OF REVIEW

We review de novo a district court's grant of summary judgment. *Med. Mut. of Ohio v. K. Amalia Enters. Inc.*, 548 F.3d 383, 389 (6th Cir. 2008). Summary judgment is properly granted where there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). We must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003)

(en banc) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)). USAA moved for summary judgment. As a result, we accept the facts alleged by Boggio as true, and we must draw reasonable inferences in his favor, in determining whether there is a "genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*. 475 U.S. 574, 587–88 (1986) (citations omitted) (explaining FED. R. CIV. P. 56).

### III.  FCRA ANALYSIS

This case requires that we address issues regarding private enforcement of FCRA's § 1681s-2. FCRA exists "to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Safeco Ins. Co. v. Burr*, 551 U.S. 47, 52 (2007). To that end, § 1681s-2 is designed to prevent "furnishers of information" from spreading inaccurate consumer-credit information. Section 1681s-2 works in two phases. Initially, furnishers have a duty to provide the CRAs with accurate information about their consumers. § 1681s-2(a). Later, a furnisher may be asked by a CRA to respond to disputes about the consumer information provided. If at some point a CRA discovers that either the "completeness or accuracy" of a consumer's information is in dispute—and provided that it does not determine the dispute to be "frivolous or irrelevant"—that CRA will then notify the original furnisher and provide it with "all relevant information regarding the dispute." § 1681i(a)(1)–(3). Upon receiving notice of a dispute from a CRA, a furnisher faces the following duties:

> After receiving notice pursuant to [§] 1681i(a)(2) of this title of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency, the person shall—
>> (A) conduct an investigation with respect to the disputed information;
>> (B) review all relevant information provided by the [CRA] pursuant to [§] 1681i(a)(2) of this title;
>> (C) report the results of the investigation to the [CRA];
>> (D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other [CRAs] to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis; and
>> (E) if an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified

>           after any reinvestigation under paragraph (1), for
>           purposes of reporting to a [CRA] only, as appropriate,
>           based on the results of the reinvestigation promptly—
>                   (i) modify that item of information;
>                   (ii) delete that item of information; or
>                   (iii) permanently block the reporting of
>                   that item of information.

§ 1681s-2(b)(1). Section 1681s-2(b)(2) establishes deadlines for "complet[ing] all investigations, reviews, and reports required under paragraph (1)" within the time frame by which a CRA must satisfy its own duties, as outlined in § 1681i(a)(1).

### A. FCRA Creates A Private Right of Action to Enforce § 1681s-2(b)

FCRA provides for multiple avenues of enforcement: the Bureau of Consumer Financial Protection and the Federal Trade Commission may bring administrative action against a furnisher,[3] various federal agencies have enforcement authority, and states may seek to enjoin violators or to recover damages on behalf of consumers. *See* § 1681s(a)–(c). In addition, FCRA expressly creates a private right of action to enforce many of its terms. Consumers may bring suit to recover actual damages, and potentially attorney's fees and costs, from "[a]ny person who is negligent in failing to comply with any requirement imposed . . . with respect to any consumer" under the Act. 15 U.S.C. § 1681o. In addition, when a person "willfully fails to comply with any requirement imposed . . . with respect to any consumer," that consumer may seek actual *or* statutory damages, as well as punitive damages and attorney's fees and costs. 15 U.S.C. § 1681n; *Beaudry v. Telecheck Servs., Inc.*, 579 F.3d 702, 705–06 (6th Cir. 2009), *cert. denied*, --- U.S. ---, 130 S. Ct. 2379 (2010).

FCRA, then, unquestionably creates a private right of action. §§ 1681n, 1681o. At issue is whether that private right of action extends to cover violations of § 1681s-2. We conclude that consumers may rely on §§ 1681n and 1681o to enforce some, but not

---

[3]On July 21, 2010, Congress created the Bureau of Consumer Financial Protection, granted it enforcement and rulemaking authority alongside the FTC, and transferred much of the FTC's authority under FCRA to the Bureau. *See generally* Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, § 1088, 124 Stat. 1376, 2086 (2010) (covering amendments to FCRA). This suit was filed before the creation of the Bureau. None of the Bureau-related amendments to FCRA disturb the analysis in this opinion.

all, subsections of § 1681s-2. This is because § 1681s-2(c) expressly precludes consumers from enforcing the requirement that furnishers, under § 1681s-2(a), initially provide complete and accurate consumer information to a CRA. § 1681s-2(c) (stating that "sections 1681n and 1681o of this title do not apply to any violation of subsection (a) of this section"); *see also* § 1681s-2(d) (reserving enforcement of § 1681s-2(a) to "the Federal agencies and officials and the State officials identified in section § 1681s of this title"). In light of § 1681s-2(c)'s express limits, consumers may step in to enforce their rights only after a furnisher has received proper notice of a dispute from a CRA. Inasmuch as CRAs need not forward frivolous disputes along to furnishers, *see* § 1681i(a)(3), this statutory framework provides consumers with a private remedy against negligent or willful misconduct by a furnisher, while it simultaneously protects furnishers from answering frivolous consumer disputes. *See Nelson v. Chase Manhattan Mortg. Corp.*, 282 F.3d 1057, 1060 (9th Cir. 2002). Such an understanding of § 1681s-2—one that recognizes a private right of action against a furnisher, but only for failing to comply with relevant requirements, here § 1681s-2(b)—has been adopted by every circuit to address the issue. *See, e.g.*, *Chiang v. Verizon New Eng. Inc.*, 595 F.3d 26, 36 (1st Cir. 2010); *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1154 (9th Cir. 2009), *cert. denied*, --- U.S. ---, 131 S. Ct. 71 (2010) (same); *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142, 149 (4th Cir. 2008) (same); *Westra v. Credit Control of Pinellas*, 409 F.3d 825, 827 (7th Cir. 2005) (impliedly assuming a private right of action exists). Therefore, we hold that consumers such as Boggio may file actions pursuant to §§ 1681n and 1681o claiming that furnishers of information have violated § 1681s-2(b).

**B. Contours of Private Suit Under § 1681s-2(b)**

In order to determine what conduct gives rise to a private remedy under § 1681s-2(b), we turn now to the contours of the five statutory duties imposed on furnishers of consumer information. While the Sixth Circuit has yet to so address private enforcement of § 1681s-2(b), *see Castleberry v. Daimler Chrysler Truck Fin.*, No. 10-11460, 2012

WL 3113205, at *4 (E.D. Mich. July 31, 2012) (slip copy), several circuits have already considered the scope of the duties it imposes on furnishers.

First, FCRA requires a furnisher to "conduct an investigation with respect to the disputed information." § 1681s-2(b)(1)(A). We join every circuit to have addressed this duty in holding that the investigation an information furnisher undertakes must be a reasonable one. *See Johnson v. MBNA Am. Bank, NA*, 357 F.3d 426, 430–31 (4th Cir. 2004); *accord Chiang*, 595 F.3d at 37; *Gorman*, 584 F.3d at 1155–57; *Westra*, 409 F.3d at 827 (assuming a reasonableness standard). As several of these circuits agree, the term "investigation" itself denotes a "fairly searching inquiry," or at least something more than a merely cursory review. *See, e.g.*, *Gorman*, 584 F.3d at 1155–57 (reviewing definitions of "investigation" considered by courts interpreting § 1681s-2(b)). Moreover, anything less than a reasonable inquiry would frustrate Congress's goal to create a system that permits consumers to dispute credit inaccuracies. As the Fourth Circuit reasoned, "[i]t would make little sense to conclude that, in creating a system intended to give consumers a means to dispute—and, ultimately, correct—inaccurate information on their credit reports, Congress used the term 'investigation' to include superficial, *un*reasonable inquiries by creditors." *Johnson*, 357 F.3d at 430–31 (emphasis in original). A consumer may show a violation of an information furnisher's duty under § 1681s-2(b)(1)(A) by showing that the furnisher's investigation was not reasonable. *Chiang*, 595 F.3d at 37 (citing *Gorman*, 584 F.3d at 1157; *Westra*, 409 F.3d at 827; *Johnson*, 357 F.3d at 429–31).

Second, FCRA requires a furnisher to "review all relevant information provided by the [CRA] pursuant to [§] 1681i(a)(2)." § 1681s-2(b)(1)(B). Alone, this duty is straightforward: a furnisher must review the pertinent information provided to it by a CRA. However, courts have interpreted this review requirement alongside the investigation requirement in § 1681s-2(b)(1)(A). In particular, how thorough an investigation must be to be "reasonable" turns on what relevant information was provided to a furnisher by the CRA giving notice of a dispute. In *Johnson*, the Fourth Circuit held that electronically confirming only a name and address—as opposed to

"consult[ing] underlying documents such as account applications"—was unreasonable when the furnisher had received information from the CRA explaining that its consumer was disputing her status as a co-obligor on her husband's debt. *Id.* at 429–31; *cf. Gorman*, 584 F.3d at 1159–61 (upholding a grant of summary judgment because the furnisher's investigation was reasonable when, "unlike in *Johnson*, [the furnisher] had—albeit earlier—gone outside its own records to investigate the allegations contained in the CRA notice."). By contrast, the Seventh Circuit held that a similarly cursory review of internal, electronic documents was reasonable because the CRA provided only "scant information . . . regarding the nature of [the consumer's] dispute." *Westra*, 409 F.3d at 827; *accord Chiang*, 595 F.3d at 40 (holding that a furnisher's investigation obligation was minimal where the CRA provides "no guidance as to either the specific information that was disputed or the basis for the dispute"). Accordingly, first and foremost a furnisher must review all relevant information provided to it by a CRA regarding a dispute in order to comply with § 1681s-2(b)(1)(B). Additionally, the nature and specificity of the information provided by the CRA to the furnisher may affect the scope of the investigation required of the furnisher. *Johnson*, 357 F.3d at 431.

Third, FCRA requires a furnisher to "report the results of [its] investigation to the [CRA]." § 1681s-2(b)(1)(C). After conducting its reasonable investigation and reviewing all relevant information provided by a CRA, a furnisher must report back its findings about a customer's information to the CRA that originally provided notice of the dispute. Unlike the following two duties, this reporting duty requires a furnisher to respond to a CRA regarding the results of the furnisher's investigation, irrespective of the outcome of its investigation.

Fourth, FCRA requires that "if the investigation finds that the information is incomplete or inaccurate," then the furnisher must "report those results to all other [CRAs] to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis." § 1681s-2(b)(1)(D). Other courts of appeals have explored the scope of the trigger under § 1681s-2(b)(1)(D) that "the investigation finds that the information is incomplete or inaccurate." For example, false information

about a consumer is clearly inaccurate, and so failing to report the discovery of false consumer information to all CRAs would violate § 1681s-2(b)(1)(D). In addition, courts have held that § 1681s-2(b)(1)(D) is violated if a report of an investigation, although it contains correct information, nevertheless "provides information in such a manner as to create a materially misleading impression." *Saunders*, 526 F.3d at 148 ("Congress clearly intended furnishers to review reports not only for inaccuracies in the information reported but also for omissions that render the reported information misleading"); *Gorman*, 584 F.3d at 1163 (omission of information can render information provided "incomplete or inaccurate" under § 1681s-2(b)(1)(D)); *cf. Sepulvado v. CSC Credit Servs., Inc.*, 158 F.3d 890, 895–96 (5th Cir. 1998) (interpreting "accuracy" requirement under § 1681e(b) to impose a duty to avoid material omissions), *cert. denied*, 526 U.S. 1044 (1999); *Koropoulos v. Credit Bureau, Inc.*, 734 F.2d 37, 40–42 (D.C. Cir. 1984) (same). In particular, the Fourth and Ninth Circuits have recognized that a furnisher violates § 1681s-2(b)(1)(D) if it fails to identify that a consumer disputes his information, at least where the consumer's dispute is "a bona fide dispute, a dispute that could materially alter how the reported debt is understood." *Gorman*, 584 F.3d at 1163 (citing *Saunders*, 526 F.3d at 151).

Fifth, a furnisher must either "modify," "delete," or "permanently block reporting of" information that it finds upon investigation to be "inaccurate or incomplete," or that "cannot be verified after any reinvestigation." § 1681s-2(b)(1)(E). Inasmuch as the scope of this duty is determined by reference to inaccurate or incomplete information, the duty equally extends to the discovery of both inaccurate or incomplete consumer information and to the discovery of consumer information that is materially misleading. In addition, a furnisher has a duty to modify, delete, or block its original reporting if it discovers, upon investigation, that it can no longer verify the consumer information it originally supplied to a CRA.

In summary, we conclude that FCRA expressly creates a private right of action against a furnisher who fails to satisfy one of five duties identified in § 1681s-2(b). A consumer who demonstrates that a furnisher was negligent in breaching one of these

duties with respect to that consumer's disputed information is entitled to actual damages under § 1681o; moreover, if a consumer can establish that a furnisher willfully violated one of its duties, then under § 1681n the consumer may recover actual or statutory damages, as well as punitive damages. Costs and reasonable attorney's fees are also authorized under both §§ 1681n and 1681o.

## IV.  REASONABLENESS OF USAA's INVESTIGATION

Boggio alleges that USAA, upon receiving CRA notices of a dispute, "failed to conduct a reasonable investigation" into whether he was a co-obligor on his ex-wife's delinquent car loan. R. 1 (Compl. ¶ 18) (Page ID #3).[4] As a result, he suffered a lower credit score and a denial of credit when USAA inaccurately reported back to the CRAs his status, and now seeks actual, statutory, and punitive damages, as well as costs and attorney's fees. *Id.* ¶ 14, 21–22 (Page ID #2–4). The district court granted summary judgment to USAA on two bases. First, it held that USAA reasonably investigated dispute notices received from various CRAs. *Boggio v. USAA Fed. Sav. Bank*, No. 1:10-cv-445-HJW, 2011 WL 3876525, at *4 (S.D. Ohio Sept. 2, 2011) (unpublished opinion). Second, the district court concluded that Boggio could not maintain a claim against USAA because he ratified Sarah's debt, and thus was not harmed when USAA accurately confirmed his status. *Id.* at *5.

**A. Genuine Dispute Exists As To Whether USAA's Investigation Was Reasonable**

We consider first whether USAA reasonably investigated the disputed information concerning Boggio's status as a co-obligor to his wife's loan. USAA's employee avers that a CRA dispute notice "stated . . . that the ex-wife purchased [the car] while they were separated." R. 16 (Galindo Dep. at 11–12) (Page ID #148–49). In light of this concession that USAA received notice regarding the specific nature of

---

[4] Boggio also alleges that USAA "failed to review all relevant information before reporting back to" the CRAs. *Id.* His complaint is ambiguous as to whether this allegation refers to information that informed USAA's original reporting—which would suggest USAA's investigation was unreasonable—or whether it refers to information provided to USAA by the CRAs, which would invoke a separate duty under § 1681s-2(b)(1)(B). Because the parties assume the former interpretation in their briefs, we limit our attention to whether USAA's investigation was reasonable.

Boggio's underlying dispute, a reasonable investigation under the circumstances would require that USAA review the relevant, underlying documentation.

Given the notice that USAA had about the nature of Boggio's dispute, we conclude that summary judgment for USAA was unwarranted; the evidence presented is not so one-sided as to mandate that USAA's investigation was reasonable as a matter of law. Boggio argues that USAA, upon receiving notices from the CRAs, had at its disposal documents suggesting Sarah's sole ownership of the car, correspondence from USAA implying that only she is the obligor, and as many as four letters from Boggio's attorney denying Boggio's liability. Appellant Br. at 19–20 (citing R. Galindo Dep. at Exs. B–G (Page ID #187–99)). Further, Boggio offers deposition testimony by a USAA employee stating that USAA reviewers were prohibited from consulting documents in his file—including the allegedly forged check in question—and instead would have verified only his identity before responding to a CRA notice. R. 16 (Galindo Dep. at 12–13, 18–21) (Page ID #149–50, 155–58). This evidence is sufficient to show a genuine dispute as to whether USAA conducted a reasonable investigation.

The district court emphasized that Boggio failed to comply with USAA's policy for fraud investigations until after bringing his lawsuit. *Boggio*, 2011 WL 3876525, at *4.[5] As part of its alleged standard procedures, USAA asserts that it requires a consumer to file a fraud affidavit or a police report before USAA will conduct further inquiry into a disputed claim. However, the mere existence of such a company policy does not resolve the inquiry into the reasonableness of its investigation. First, on the record presented Boggio was notified of this policy on March 11, 2010, R. 15-1 (Lincoln Decl. ¶¶ 8–9) (Page ID #90), but the record apparently indicates that USAA would have completed at least one investigation in November 2009. *See id.* at ¶¶ 5–7 (Page ID #89–90). Therefore, Boggio's failure to provide a fraud affidavit or police report could

---

[5] USAA also argues that Boggio concedes it "was reasonable . . . for USAA to investigate" and that "it would be reasonable for USAA to want to have some verified sworn statement before it did anything." Appellee Br. at 18 (citing R. 15-3 (Boggio Dep. at 83) (Page ID #119). Boggio's opinion as to what it would have been reasonable for USAA to do in response to a CRA's notice of dispute neither addresses whether USAA's investigation was in fact reasonable nor identifies the scope of USAA's statutory duty to conduct an investigation under § 1681s-2(b)(1)(A).

not have affected USAA's already completed investigation. Second, the text of § 1681s-2(b) does not permit furnishers to require independent confirmation of materials contained in a CRA notice of a dispute before conducting the required investigation. At issue is whether USAA's actual investigation was reasonable, and not whether it was reasonable for USAA to have an optional, more thorough review available to consumers.[6] Boggio's failure to comply with USAA's fraud policy does not disturb our conclusion that a genuine dispute of material fact exists regarding the reasonableness of USAA's investigation, and so summary judgment is inappropriate.

## B. Willful Violation of § 1681s-2(b)

The district court found that USAA did not willfully violate § 1681s-2(b), relying on its belief that Boggio conceded any claim under § 1681n when he said that he did not believe that "USAA did anything to intentionally put [him] in this situation." *Boggio*, 2011 WL 3876525, at *4 (quoting R. 15-3 (Boggio Dep. at 82) (Page ID #119)). While Boggio's deposition testimony may be relevant to determining the issue of willfulness, we do not believe that his use of the word "intentionally" conclusively resolves the matter. The Supreme Court has interpreted willfulness, in the context of § 1681n, "to cover not only knowing violations of a standard, but reckless ones as well." *Safeco*, 551 U.S. at 57. The Court further explained that "a company subject to FCRA does not act in reckless disregard of it unless . . . the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id.* at 69.

That USAA did not "intentionally" put Boggio in his situation does not preclude USAA having a reckless disregard towards its duty to investigate and report back the

---

[6]USAA appears to derive its fraud policy from § 1681g(e), which concerns identify theft. *See* § 1681g(e)(2)(B) (stating that a business entity may (but need not) require a consumer to provide "a police report evidencing the claim of the victim of identity theft," and an affidavit alleging identity theft.). Section 1681g is inapplicable to this case, because it concerns a consumer communicating directly with a business. Unlike § 1681g, § 1681s-2(b) does not specifically permit information furnishers to demand further documentation from consumers before conducting an investigation. Failure of a consumer to provide identify-theft information listed under § 1681g cannot obviate a furnisher's § 1681s-2(b) duty; otherwise, Congress would have indicated as much by including or cross-referencing the same language of § 1681g within § 1681s-2(b) itself.

results of its investigation to the CRAs. Boggio provides deposition testimony stating that USAA's policy prohibited its employees from performing anything more than a cursory confirmation of his status before reporting back to a CRA, and a declaration by a USAA employee that USAA "followed its internal procedures in responding to the credit report disputes." R. 15-4 (Galindo Decl. ¶ 11) (Page ID #123). USAA responds that no such policy was followed in this case, as evidenced by the fact that USAA attempted to send Boggio a copy of the disputed check in November 2009. R. 15-1 (Lincoln Decl. ¶¶ 7) (Page ID #89–90). Determining whether USAA's conduct demonstrated a reckless disregard for the § 1681s-2(b) requirements thus involves disputed facts. Because Boggio has produced evidence sufficient to present a genuine dispute regarding whether USAA violated § 1681s-2(b), we conclude that summary judgment was unwarranted.

## V. RATIFICATION CLAIM

In addition to holding that USAA's investigation was reasonable, the district court granted summary judgment on the separate basis that Boggio ratified Sarah's car loan when he signed their December 2008 marital separation agreement. Because we determine that resolving whether Boggio ratified the disputed debt turns on the proper application of Texas law to the facts, we reverse the grant of summary judgment on these grounds and remand for further consideration.

### A. Choice of Law

This suit arises under FCRA, a federal statute. However, the dispute over ratification concerns issues of agency and contract formation, which are matters of state law. "In determining which states' law applies, our analysis is governed by the choice of law principles derived from federal common law." *Med. Mut. of Ohio v. deSoto*, 245 F.3d 561, 570 (6th Cir. 2001). Having no established federal choice-of-law rules for FCRA, we look to the Restatement (Second) of Conflicts of Laws. *Id.* The parties agree that the state-law issue here concerns whether Boggio ratified Sarah's car loan when he signed their marital separation agreement, and thus depends on contract law.

*See* Appellant Br. at 30 (citing RESTATEMENT (SECOND) OF CONFLICTS OF LAW § 188 (1971)); Appellee Br. at 9 ("USAA FSB agrees with Boggio that [§ 188] is applicable to determine the choice of law for the underlying loan transaction and its ratification.").[7] Boggio argues that either Texas law or Kentucky law could govern, and that he prevails under either law. USAA counters that Texas law should apply, which matters for an independent, community-property argument.[8] We conclude that Texas law applies.

Section 188 of the Restatement advises consideration of the following factors: the place of contracting, the place of contract negotiation, the place of performance, the location of the subject matter of the contract, and the residence of the parties. RESTATEMENT (SECOND) OF CONFLICTS OF LAWS § 188(2). Moreover, when negotiations and performance occur in the same state, the local law of that state will usually be applied. *Id.* § 188(3). The underlying contract formation dispute concerns whether Boggio authorized or ratified Sarah's signing his name on a check for purchasing a car. The Boggios resided in Texas at the time when an agency relationship would have existed. Meanwhile, Sarah negotiated the car purchase in Texas. She stayed in Texas at least during the length of the marriage, during which time she made payments on the car that was insured in Texas. These facts are more than sufficient to satisfy the specific considerations recommended by §188. Texas law governs.

**B. Texas Agency and Ratification Law**

The district court found, on the basis of general principles of agency law, that Boggio ratified Sarah's USAA car loan. Applying Texas agency law, we disagree that the facts are so one-sided as to conclude, as a matter of law, either that Sarah was her husband's agent or that Boggio ratified her unauthorized conduct by signing a separation agreement. Accordingly, we remand both questions for consideration by the trier of fact. *See Pitman v. Lightfoot*, 937 S.W.2d 496, 523 (Tex. Ct. App. 1996) ("[W]hen the act or

---

[7] The parties do not direct us to the Restatement's specific rules for agency relationships within contract law. *See* RESTATEMENT (SECOND) OF CONFLICTS OF LAWS § 292 (applying the "most significant relationship" test). Nevertheless, the outcome would be unaffected.

[8] Texas is a community-property state. Kentucky is not. We address the community-property argument *infra* at Section V.C.

acts of ratification are controverted, the question of ratification must be left to the trier of fact.").

Under Texas law, "[r]atification occurs when a principal, though he had no knowledge originally of an unauthorized act of his agent, retains the benefits of the transaction after acquiring full knowledge." *Id.* at 522 (citing *Land Title Co. of Dallas, Inc. v. F. M. Stigler, Inc.*, 609 S.W.2d 754, 757 (Tex. 1980)). "The critical factor in ratification cases is whether the allegedly ratifying party had full knowledge at the time of the alleged ratification and what it did in light of that knowledge." *Tex. First Nat'l Bank v. Ng*, 167 S.W.3d 842, 862 n.37 (Tex. Ct. App. 2005) (citing *Stigler*, 609 S.W.2d at 756); *see also Frazier v. Wynn*, 472 S.W.2d 750, 753 (Tex. 1971). Once full knowledge of the transaction is established, courts look to whether a principal "retains benefits under it," *Willis v. Donnelly*, 199 S.W.3d 262, 273 (Tex. 2006), or expresses an intent to be bound to the transaction. *See Providian Nat'l Bank v. Ebarb*, 180 S.W.3d 898, 901 (Tex. Ct. App. 2005) (stating that ratification is "[l]argely a matter of intent").

We conclude that there is a genuine dispute of material fact as to whether Boggio's signing a separation agreement constitutes full knowledge under Texas law. Boggio learned of the car purchase in December 2008 when the loan appeared as marital debt in the couple's separation agreement, and he admits that the car loan was then showing on his credit report. Additionally, while the separation agreement states that Sarah was solely responsible for the vehicle and agreed to indemnify Boggio for any amount he was "required to pay for the purchase of this vehicle," this provision could be read in favor of both parties. Boggio asserts it is evidence that he had no intent of affirming the car loan; yet, the fact that the indemnification clause applies only to Sarah's vehicle and there is no similar indemnification clause related to Boggio's vehicle may be evidence that Boggio recognized the car as marital debt, and thus that he may have had some responsibility for the debt. However, Boggio remained unaware that his name had actually been signed to purchase the car until his credit problems began. A reasonable jury could find that although Boggio knew the loan was marital debt, he lacked full knowledge about the purportedly ratified conduct. *See Ng*, 167 S.W.3d at

863 ("[R]atification of the *results* of conduct without full knowledge of the conduct does *not* constitute express (or implied) ratification of the conduct.") (emphasis added).

Even if full knowledge were settled as a matter of law, there is still genuine disagreement as to whether Boggio possessed the requisite intent or whether he derived a benefit. Boggio argues that the separation agreement made plain that he had no intent to affirm the car loan, but as stated above, the separation agreement is ambiguous with respect to the extent of Boggio's knowledge of the loan, and thus his intent to ratify the loan; USAA argues that intent is implied by the fact that he did not contest the 2008 credit report. *Compare* Appellant Br. at 32–33, *with* Appellee Br. at 11–12. Boggio asserts that he did not benefit from a car that he neither saw nor drove; USAA contends that he benefitted by being able to keep his own car and by being positioned to collect on a potential insurance payout. *Compare* Appellant Br. at 33, *with* Appellee Br. at 12. Assessment of these arguments turns largely on the credibility of such testimony. Thus, resolution of this issue is properly handled by a trier of fact.

Finally, the district court's ratification discussion appears to assume that, at the time of the car loan, Sarah was an agent of Boggio with the capacity to bind him to the loan. On the record presented, it is not clear that Sarah acted as Boggio's agent when she purchased a car. Merely being husband and wife at the time of the loan would not satisfy Texas's agency requirements. TEX. FAM. CODE ANN. §3.201(c) (West 2006) ("[A] spouse does not act as an agent for the other spouse solely because of the marriage relationship."). Rather, to decide whether one spouse has bound the other to a debt, Texas appears to follow two distinct legal tests, and reserves each test for different sets of factual circumstances. *Compare Cockerham v. Cockerham*, 527 S.W.2d 162, 171 (Tex. 1975) ("[T]o determine whether a debt is only that of the contracting party or if it is instead that of both the husband and wife, it is necessary to examine the totality of the circumstances in which the debt arose."), *with In re Trammell*, 399 B.R. 177, 186–88 (Bankr. N.D. Tex. 2007) (determining that *Cockerham* applies "where someone is seeking to hold one spouse jointly liable for a debt based on that spouse's acts where the debt is facially owed by the other spouse," but that otherwise *Cockerham* has been

replaced by TEX. FAM. CODE ANN. §3.201(a)) (emphasis in original). We leave these matters for further consideration upon remand to the district court.

### C. Community-Property Arguments

USAA argues for the first time on appeal that Texas is a community-property state, and therefore contends that Boggio is jointly liable for the marital debt even without ratification. "While we may affirm a district court's judgment for reasons other than those stated by the lower court, we may also choose to disregard an appellee's alternative argument." *United States v. Boumelhem*, 339 F.3d 414, 428 (6th Cir. 2003) (internal citations omitted). Texas recognizes an arguably relevant exception for "special community property," also known as "sole management community property." TEX. FAM. CODE ANN. § 3.102 (West 2006); *Patel v. Kuciemba*, 82 S.W.3d 589, 596 (Tex. Ct. App. 2002); *cf. In re Trammell*, 399 B.R. at 184 (finding that "Texas courts have not articulated a test that can be readily applied to determine what facts" distinguish types of community property). Given the fact-intensive efforts needed to determine the car's community-property status, this argument's interrelatedness with ratification, and its dependence on a developed analysis of state law, we decline to uphold summary judgment on this basis, but leave further consideration to the district court, if it is so inclined.

### VI. CONCLUSION

In light of the discussion above, we **REVERSE** the district court's grant of summary judgment, and **REMAND** for further proceedings consistent with this opinion.